IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| E W Wylie Corporation, a North Dakota corporation, | ) ) ) | Case No. 3:11-cv-48 |
| Plaintiff, | ) ) ) | **MEMORANDUM OPINION & ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT** |
| -vs- | ) ) ) | |
| Hard Rock Specialized LLC, a Mississippi limited liability company; Hard Rock Heavy Haul LLC, a Mississippi limited liability company, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## I. INTRODUCTION AND BACKGROUND

Before the Court are Plaintiff E W Wylie Corporation's (hereafter "Wylie") motion for partial summary judgment (Doc. #78) and Defendants Hard Rock Specialized LLC (hereafter "Specialized") and Hard Rock Heavy Haul LLC's (hereafter "Heavy Haul") motion for partial summary judgment (Doc. #85). The matter came regularly on for a hearing on March 13, 2013. A bench trial is set for May 28, 2013. The Court, having carefully considered the evidence and the arguments of the parties, now issues this memorandum opinion and order.

## II. SUMMARY OF DECISION

This dispute arises out of a contractual relationship pertaining to the transport of windmill parts from the east coast to Utah. Wylie submitted a proposal to Specialized, which was rejected by Specialized. Specialized submitted a counterproposal that was rejected by Wylie. After negotiating for several more weeks, the parties reached an agreement on pricing. A new contract was sent to Specialized by Wylie. Specialized made some changes to the contract that Wylie

1

drafted.  Wylie agreed to the changes.  One of those changes reincorporated into the contract the assumptions and clarifications initially proposed by Specialized.  The plain language of the contract is clear: the parties agreed that the document entitled "Hard Rock Specialized's Assumptions and Clarifications" controls the payment obligations that are in dispute.  Wylie's motion for partial summary judgment to limit the damages to the outstanding line haul invoices is DENIED.

Specialized's motion for partial summary judgment is GRANTED, IN PART and DENIED, IN PART.  Specialized may present evidence of its damages for nonpayment of detention and standby costs, police escort fees, crane costs, bucket truck expenses, and flat bed expenses at trial.  While there appears to be only a remote likelihood of success, Specialized may also present evidence of its alleged special damages for the loss of two trailers and the loss of a down payment on two trailers.  Likewise, Wylie may present evidence of alleged damages relating to damaged components and payments made to third parties.

Specialized also seeks dismissal of Wylie's claim for attorney fees.  Because the claim for attorney fees arises from a contractual obligation that Wylie incurred as a result of Specialized's breach of the contract, the attorney fees may be recoverable as an element of damages. See Barsness v. Gen. Diesel & Equip. Co., Inc., 422 N.W.2d 819, 827 (N.D. 1988).

### III. Relevant Facts

First Wind Energy, LLC (hereafter "First Wind") was developing a wind generating project in Milford, Utah ("the Milford Project"). On September 15, 2010, Wylie entered into a Transportation Facilitation Agreement with First Wind.  Wylie agreed to move wind tower components from New York and Maine to Milford, Utah (Doc. #47-1, p. 15 of 71).  The

deliveries were to occur between November 1, 2010, and January 21, 2011. Id. at p. 25. The contract set a fixed price per delivered component with limited and defined extra costs to be paid by First Wind. Id. at p. 27. After change orders, First Wind paid Wylie $15,477,812 for transportation services in moving the components (Doc. #80, Aff. Gast ¶5).[1]

Wylie subcontracted a portion of the Milford Project, $2,290,876, to Specialized (Doc. #1-1).[2] The parties began negotiating the terms of a transportation contract in April 2010 (Doc. #80, Aff. Gast ¶ 2). The undisputed details surrounding the formation of the contract are set forth as follows. On April 9, 2010, Wylie sent Specialized its pricing for transporting base sections and mid tower sections out of New York and Maine (Doc. #80-6, p. 25). Specialized rejected the proposal on April 12, 2010, reasoning that after determining its cost per load, including permit fees, escorts, state escorts, and fuel expenses, it could not "make the mid tower sections line haul rate work out." (Doc. #80-6, pp. 20-21). Wylie then requested Specialized's rate for transporting the mid tower sections "as far as" Manly, Iowa. Id. at 19. Specialized provided its rate, and Wylie responded: "That is getting closer. . ." Id. at 17.

Wylie also inquired about Specialized's rates for transporting the bases. Specialized

---

[1] Despite the last component being delivered on April 19, 2011, payment of $2,461,339 was delayed for several months due the payment disputes (Doc. #80, Aff. Gast ¶51).

[2] Until the payment disputes arose, Wylie was unaware that Specialized was using its affiliate, Hard Rock Heavy Haul, to move some of the wind tower components. Specialized directly hauled some of the components pursuant to the parties' contract and Heavy Hall arranged the transportation of some of the other components. Heavy Haul concedes the work it did was under the terms of the contract Specialized entered into with Wylie. Specialized dissolved in March 2011. Specialized claims it was forced to dissolve because it was not paid by Wylie. The reason or reasons for the dissolution need not be considered, as they are not germane to the pending motions.

3

informed Wylie: "We did run the numbers on the base[s] and sharpened our pencils but we could not find a way for it to pencil out. Please do keep us in mind on future work as we would like to work with you." Id. at 12. On April 26, 2010, Wylie notified Specialized that the project had been delayed and the shipping destination changed. Id. at 11. It inquired whether Specialized was interested in requoting. Id. On April 27, 2010, Specialized sent a proposal, indicating "This is the best I can do on bases." Id. at 8. Wylie wondered whether the pricing was "all inclusive". Id. at 7. Specialized's responded: "I am thinking yes but have a few questions before I answer." Id. at 6.

On April 29, 2010, Wylie sent its carrier agreement to Specialized. Id. at 4. Specialized told Wylie to "see attached for comments and questions?" Among other questions, attached was a revised contract with a change made to Paragraph 15 that was highlighted in red. (Doc. #87, Aff. Roberts ¶ 15; Doc. #81-1, Dep. Roberts pp. 20-21 of 54). The paragraph drafted by Wylie read:

> **15. Taxes and Assessments & Other Fees.** Carrier [Specialized] shall pay all taxes and assessments arising out of the transportation of Goods by Carrier [Specialized], including all required permits, escorts [sic] cars, police escorts, bridge monitors, electrical contractors, and any other costs of transporting the Goods.

The paragraph revised by Specialized read:

> **15. Taxes and Assessments & Other Fees.** Carrier [Specialized] shall pay all taxes and assessments arising out of the transportation of Goods by Carrier [Specialized], including all required permits, escorts [sic] cars, police escorts, bridge monitors, electrical contractors, and any other costs of transporting the Goods, <u>that was included in carriers assumptions and clarifications at the time of bid</u>.

On May 3, 2010, Wylie informed Specialized that "We are fine with your requested changes." (Doc. #80-6, p. 2). Scott Hoppe ultimately signed the contract on behalf of Wylie

4

(Doc. #88-2, Dep. Hoppe p. 21). Hoppe believes the change to Paragraph 15 was "approved through the legal process with our attorney." Id.

On May 3, 2010, Wylie also asked Specialized to "confirm that you can still support and we will update the contract language and send out rate addendums for your review." Id. On September 15, 2010, Specialized inquired whether the parties had a contract. Id. at 1. Wylie said, "Yes, we will get the exhibits together and send over for your signature." Id. Wylie and Specialized entered into a contract for the transportation of both mid tower and base sections on or about September 25, 2010 (Doc. #80-3, Transportation Brokerage Agreement; Doc.# 80, Aff. Gast ¶ 13). Both sides agree that this is the contract governing the parties's dispute in this action.

Specialized began shipping components in October 2010. The 2010-2011 winter in the Northeast was cold and snowy, causing difficulties, delays, and extra costs for transportation carriers. Specialized notified Wylie by email of the additional costs it was incurring on the Milford Project (Doc. #80-20; 80-21; 80-22). Because of the higher-than-expected costs, Specialized advised Wylie that it could not "afford any more hits." (Doc. #80-20). Wylie agreed to modify the contract to address some of Specialized concerns. Wylie agreed to increase component rates to Mattawamkeag, Maine and also Buffalo, New York (Doc. #80, Aff. Gast ¶ 24; Doc. #80-11; Doc. #80-12; Doc. #80-13). Wylie also agreed to pay for police escorts through Vermont after November 19, 2010. Id. At times, Wylie also agreed to pay limited additional costs (Doc. #80, Aff. Gast ¶ 30).

By late February/early March 2011, Specialized had completed all of the loads it was to haul. By this time, Heavy Haul had completed most, but not all, of the loads it had arranged through second-tier subcontractors. On March 7, 2011, Heavy Haul submitted a "stop work

notice" to Wylie (Doc. #80-14). This notice advised Wylie that all third-party subcontractors retained by Heavy Haul would stop shipping until the payment issues were resolved. Id.

On March 11, 2011, Wylie and Heavy Haul executed a settlement agreement, addressing the loads Heavy Haul handled (Doc. #26-12). The settlement pertained to "all remaining carrier pay and ancillary charges for transportation loads subcontracted to Hard Rock in regards to the First Wind Milford II project." Id. Hard Rock agreed to complete the "in progress" loads to the job site, and Wylie agreed to pay the "in progress" loads upon delivery and the remaining "open" balances immediately. Id. A scheduled of payments was included in the settlement agreement. The parties disagree about whether the settlement agreement also encompasses the loads handled by Specialized; however, this factual dispute is not before the Court in these pending motions.

Under the terms of the settlement agreement, Wylie concedes it owes $510,300.00 to Heavy Haul for the in-progress loads. According to Wylie, it has paid $390,500.00, leaving a balance of $119,800.00. Wylie also contends it is entitled to deductions for alleged damaged components, alleged payments made directly to third parties, and for alleged expenses incurred in resolving claims against First Wind. (Doc. #80, Gast Aff. ¶ 44). Heavy Haul, however, contends that Wylie owes it $131,800.00 on the outstanding line haul invoices, plus interest for the loads that were in progress.[3] The exact amount of the damages for the outstanding line haul invoices, if any, is a factual dispute the parties agree must be resolved at trial.

Specialized initially claimed that Wylie owed $75,300.00 for outstanding line haul

---

[3] Heavy Haul initially asserted that it was also owed additional funds related to detention costs, state trooper fees and route change expenses, and subcontractor expenses relating to the stop work notice. Since the filing of the summary judgment motions, Heavy Haul has abandoned these claims. Heavy Haul's claim pertaining to the outstanding line haul invoices is, at most, $131,800.00, plus interest.

invoices. Wylie believes the amount is $67,300.00, less certain deductions for alleged payments to third parties, alleged damaged components, and alleged expenses incurred in claims made against First Wind. Following summary judgment briefing, Specialized concedes that, at most, it is owed $67,300.00, plus interest for the outstanding line haul invoices. The exact amount of the damages, if any, is a factual dispute to be determined at trial.

In dispute in the pending summary judgment motions are the following items Specialized alleges Wylie is obligated to pay:

| | | |
|---|---|---|
| A. | Blade Standby Costs | $171,000 |
| | Henderson Standby Costs | $139,500 |
| | Tower Storage/Standby Detention | $298,500 |
| B. | Police Escort Fees | $88,338.54 |
| C. | Crane and Rigging Costs | $9,728.62 |
| D. | Bucket Truck Costs | $10,505.22 |
| E. | Flatbed charge | $3,000 |
| F. | Lost trailers and Down Payment | $430,000 |

The Transportation Brokerage Agreement between Wylie and Specialized (hereafter "the contract") provides, in relevant part, as follows:

> **1. Scope of Work.** This Agreement shall apply to the shipments of goods and property which are listed in Exhibit A attached hereto (collectively, the "**Goods**") and tendered to Carrier [Specialized] for delivery to the Project. . . .
>
> **2. Services, Vehicles, Equipment, and Drivers.** Subject to the terms hereof, Carrier [Specialized] agrees to transport the Goods tendered to it by Broker [Wylie] to the locations specified by Broker [Wylie] as described in Exhibit A, and deliver such Goods to the location specified by Broker [Wylie] on or before the dates specified when the loads are tendered to Carrier [Specialized] by Broker [Wylie] (the "**Delivery Dates**"). Carrier [Specialized] shall use commercially reasonable efforts to effect timely delivery of the Goods and for such purpose shall commit to the

Project an appropriate lot of transportation equipment to support equipment rotation and timely deliveries.

Carrier [Specialized], at its cost and expense, shall (a) furnish, operate, and maintain in good working condition the motor vehicles and allied equipment necessary to fulfill Carrier's obligations hereunder; (b) provide qualified, trained, and licensed drivers; and (c) hold or procure all licenses, permits and governmental approvals required for provisions of such services and provide copies of such documentation prior to commencing any work under this Agreement.

* * *

**4. Rates and Charges.** As full and complete payment for full and complete performance of the scope of services and other obligations under this Agreement, Broker [Wylie] shall pay Carrier [Specialized] in accordance with the schedule of charges set forth in Exhibit B.

**5. Payment Terms**

**5.1 Commencement of Work.** Carrier [Specialized] agrees to commence certain work under this Agreement, in a timely fashion in order to meet the delivery schedule contemplated in Exhibit A.

**5.2 Payment Terms.** All fees due Carrier under this Agreement shall be invoiced on a mutually agreed upon invoice form and according to the schedule of values listed in Exhibit B for components delivered to the Pad Site, or such other laydown yard as designated by Broker, for components delivered ahead of the scheduled deliveries. After receipt of the invoice, bill of lading and signed delivery receipt, the undisputed amounts due shall be payable by Broker within thirty (30) days from the date of receipt by Broker of an invoice together with all supporting documentation for such shipping services and waivers and releases of liens (as described below).

* * *

Carrier further acknowledges and agrees that Broker is an independent contractor as to its customer, and is not the agent of any customer. Accordingly, Carrier agrees that it shall not look to the customer of Broker under any circumstances for payment for freight charges. On all shipments arranged to be shipped by Carrier pursuant to this Agreement, Carrier shall invoice Broker and Broker only. Broker agrees to perform all billing to any shipper, receiver, consignor or consignee for freight charges in connection with loads and/or traffic arranged by Broker and transported by Carrier. Payment of the freight charges to Broker shall relieve shipper, receiver, consignor or consignee of any liability to the Carrier for

nonpayment of charges, notwithstanding the failure of the shipper, receiver, consignor or consignee to sign off on Section 7 of the Bill of lading. Carrier's sole recourse for payment of freight charges shall be the Broker.

* * *

**15. Taxes and Assessments & Other Fees.** Carrier [Specialized] shall pay all taxes and assessments arising out of the transportation of Goods by Carrier [Specialized], including all required permits, escorts [sic] cars, police escorts, bridge monitors, electrical contractors, and any other costs of transporting the Goods, that was included in carriers assumptions and clarifications at the time of bid.

(Doc. #80-3).

Wylie asserts that, under the plain language of the contract, it is only obligated to pay the per component fixed prices set forth in Exhibit B of the contract (minus deductions for damaged equipment, payments to third parties, etc). Wylie claims that costs and expenses related to standby, detention, police escorts, bucket trucks, and lost lease equipment are the sole responsibility of the carrier.

Specialized maintains that under the contract Wylie bears the responsibility for paying costs and expenses related to standby/detention, police escorts, cranes, and other truck-related costs. Specialized contends that the reference in Paragraph 15 to "carriers assumptions and clarifications" clearly shifted the responsibility for payment from the carrier to the broker. Wylie counters that the assumptions and clarifications document was initially proposed by Specialized in the April bid, however, the terms were rejected during the bidding process, and the contract, as a whole, is intended to be a standard line haul rate contract in which the carrier pays for the expenses it incurs.

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact

9

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The burden is on the moving party to establish the basis for its motion. Donovan v. Harrah's Md. Heights Corp., 289 F.3d 527, 529 (8th Cir. 2002). Evidence must be viewed in the light most favorable to the nonmoving party, and the nonmoving party enjoys the benefit of all reasonable inferences to be drawn from the facts. Quinn v. St. Louis County, 653 F.3d 745, 750 (8th Cir. 2011). If the moving party shows there are no genuine issues of material fact, the burden shifts to the non-moving party to set forth facts showing a genuine issue for trial. Donovan, 289 F.3d at 529. The non-moving party "may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." Wingate v. Gage County Sch. Dist., No. 34, 528 F.3d 1074, 1078 (8th Cir. 2008).

A fact is "material" if it might affect the outcome of the case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The basic inquiry is whether the evidence presents a sufficient disagreement to require full consideration on the merits by a jury, or whether it is so one-sided that one party must prevail as a matter of law. Diesel Mach., Inc. v. B.R. Lee Indus., 418 F.3d 820, 832 (8th Cir. 2005). Where a party has failed to present evidence sufficient to create a jury question as to an essential element of its claim, summary judgment is appropriate. Gentry v. Georgia-Pacific Corp., 250 F.3d 646, 69-50 (8th Cir. 2001).

"Under North Dakota law, the construction of a written contract is initially a question of law." Olander v. State Farm Mut. Auto. Ins. Co., 317 F.3d 807, 809 (8th Cir. 2003). A determination of whether a contract is ambiguous must be made from the four corners of the

10

document. Id.; N.D. Cent. Code § 9-07-04. Courts presume the parties to the contract intended for every clause to have some effect. Semi-Materials Co., Ltd. v. MEMC Electronic Materials, Inc., 655 F.3d 829, 833 (8th Cir. 2011) (quoting Fein v. R.P.H., Inc., 68 S.W.3d 260, 266 (Tex.App. 2002)); N.D. Cent. Code § 9-07-06. "A contract may be explained by reference to the circumstances under which it was made and the matter to which it relates." N.D. Cent. Code § 9-07-12.

The North Dakota Supreme Court has noted "an unambiguous contract is particularly amenable to summary judgment." Rogstad v. Dakota Gasification Co., 623 N.W.2d 382, 387 (N.D. 2001) (citing Garofalo v. Sait Joseph's Hosp., 615 N.W.2d 160 (N.D. 2000)). On the other hand, if the meaning and intent of the language in a contract is uncertain and subject to more than one reasonable interpretation, the terms of the contract and the parties' intent become questions of fact. Id.; Olander, 317 F.3d at 809. When a contract is found to be ambiguous, extrinsic evidence regarding the parties' intent may be considered. Id.

## V. Discussion

The contract was formed following several rounds of negotiation. The undisputed facts establish that Wylie sent a proposal to Wylie in April 2010. Specialized rejected that proposal in April 2010, and countered with its own proposal that incorporated a document entitled "Hard Rock Specialized's Assumptions and Clarifications." Wylie rejected Specialized's counterproposal; however, over the next couple of weeks the parties continued discussing pricing for the project. When the parties came to an agreement on pricing, Wylie sent a proposed contract for Specialized's review. Specialized requested changes to the contract, including additional language in Paragraph 15 that reincorporates Specialized's assumptions and

11

clarifications that had been submitted in April 2010. Wylie accepted Specialized's changes to the contract on May 3, 2010, and the contract was executed on September 25, 2010. Thus, the contract was finalized and executed following a series of negotiations.

Both sides contend the September 25, 2010, contract is unambiguous; however, both sides also rely on extrinsic evidence to support their interpretation of the contract's meaning. Typically, extrinsic evidence is only considered when the contract is ambiguous, Olander, 317 F.3d at 809, and if the contract is ambiguous, the matter is not amenable to summary judgment. For the reasons set forth below, the Court agrees with the parties that the contract is unambiguous. Thus, there is no need to look to extrinsic evidence to determine the parties' intent.[4]

### A. Specialized's Claim for Costs Related to Standby and Detention; Police Escorts; Cranes; Bucket Trucks; and Flat Bed Charge

First and foremost is a determination on whether the contract is ambiguous. The dispute can be resolved by looking at Paragraph 15, which reads as follows:

> **15. Taxes and Assessments & Other Fees.** Carrier [Specialized] shall pay all taxes and assessments arising out of the transportation of Goods by Carrier [Specialized], including all required permits, escorts [sic] cars, police escorts, bridge monitors, electrical contractors, and any other costs of transporting the Goods, that was included in carriers [sic] assumptions and clarifications at the time of bid.

Under Specialized's interpretation, the addition of the last clause shifted the payment burden of the costs at issue from Specialized to Wylie. According to Wylie, the contract was intended to be a standard line haul rate contract and the clause's addition merely limited Specialized exposure to certain costs and fees in accordance with the assumptions and

---

[4] Even if the Court looked to the extrinsic evidence presented by the parties, it would not alter its decision.

clarifications.

The plain language of the contract governs if it is clear. N.D. Cent. Code § 9-07-02. According to Paragraph 15, Specialized is obligated to pay those taxes and assessments related to the transportation of the components *included in its assumptions and clarifications*. Both sides agree on the applicable assumptions and clarifications referenced in the contract. Incorporating the assumptions and clarifications into the contract, Specialized is obligated to pay for all equipment, pilot escorts, permit costs at the time of the proposal, and drivers' labor. Wylie, in contrast, is obligated to pay for any additional third party services such as police escorts, bucket trucks, cranes, tree trimmers, engineer drawings, and additional equipment other than that included on the document. In the event of delays, Wylie is also obligated to pay for detention fees at a rate of $150 per hour up to ten hours a day, excluding three hours of wait time at the point of origin and destination. Although bearing the brunt of the costs set forth in the assumptions and clarifications might not have been Wylie's subjective intent, the objective intent of the contract places the responsibility on Wylie. Wylie specifically indicated that it was "fine" with the addition of the clause at the end of Paragraph 15 and signed the contract. Its strained interpretation of the meaning of the clause is foreclosed by a plain reading of the provision.

In support of its interpretation, Wylie also asserts that the Court should look to various other contractual provisions and find the parties intended to make it Specialized's responsibility to pay for the costs in dispute. The additional provisions relied on by Wylie, like Paragraph 15, indicate the party who is responsible for certain costs and how the costs should be invoiced. These provisions do not alter the plain meaning and clear intent of Paragraph 15.

Wylie's motion for partial summary judgment to dismiss Specialized's alleged standby

and detention costs; police escort fees, crane and rigging costs; bucket truck costs; and flat bed expenses is **DENIED**. Specialized's cross motion on this same issue is **GRANTED** to the extent that it may present evidence at trial on these particular categories of alleged damages. Likewise, Wylie may present evidence of deductions for damaged components and of payments made to third parties. The exact amount of damages Specialized or Wylie is entitled to recover, if any, is a fact issue to be determined at trial.

    B.    <u>Specialized's Claims for Loss of Two Trailers and Loss of Down Payment on Two Trailers</u>

Specialized contends that if Wylie had not breached the contract with regard to the payment of expenses that Wylie was contractually obligated to pay, Specialized would not have lost two trailers and a $50,000 payment on the purchase of two new trailers.[5] Wylie counters that the alleged damages were not a detriment proximately caused by the alleged breach.

Section 32-03-09, N.D. Cent. Code, addresses damages for breach of contract:

> For the breach of an obligation arising from contract, the measure of damages, except when otherwise expressly provided by the laws of this state, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby or which in the ordinary course of things would be likely to result therefrom. No damages can be recovered for a breach of contract if they are not clearly ascertainable in both their nature and origin.

Damages for breach of contract are "limited to those damages the parties entering into the contract actually anticipated or which were so probable and natural the damages would reasonably have been anticipated." NDJIG C-74.00. Furthermore, except for cases where exemplary or penal damages are authorized, the recovery of damages cannot be more than that

---

[5] Specialized agrees to dismissal of its claim for lost profits and other losses related to leased equipment.

14

which would have been gained by performance. N.D. Cent. Code § 32-03-36. Only when reasonable persons can draw but one conclusion does an issue become a question of law for the court. Peterson v. Zerr, 477 N.W.2d 230, 236 (N.D. 1991).

By entering a contract with Specialized, Wylie did not become a guarantor of the continued viability of Specialized's business. Instead, Wylie was obligated to perform under the terms of the contract. Damages for breach of its obligations are those that were actually anticipated or so probable and natural that they should have been reasonably anticipated. The Court is skeptical that Specialized can meet its burden of proof and recover damages for the loss of the trailers and down payment. Nevertheless, the determination of damages, if any, is typically left to the sound discretion of the fact finder at trial. Farmers Ins. Exchange v. Schirado, 717 N.W.2d 576, 583 (N.D. 2006). Likewise, whether a party has made a good faith effort to mitigate damages is also finding of fact. Coughlin Const. Co., Inc. v. Nu-Tec Industries, Inc., 755 N.W.2d 867, 872 (N.D. 2008).

Although there might only be a remote likelihood of success on recovery for these alleged damages, there are fact issues regarding whether Wylie should have reasonably anticipated the alleged damages if it breached the contract; therefore, Wylie's motion for summary judgment on this issue is **DENIED**. The Court recognizes the late disclosure by Specialized of these particular alleged damages. If Wylie needs more time to conduct discovery or prepare to defend against this particular issue, it should file a motion with the Court.

C. Wylie's Claim for Attorney Fees

Wylie seeks to recover $39,750.24 for attorney fees it paid to First Wind. In this action, Specialized joined First Wind as a third-party defendant. First Wind retained counsel and moved

15

to dismiss the claims (Doc. #45). Before the motion was ripe for resolution, Specialized agreed to dismiss First Wind (Doc. #49). First Wind and Wylie settled their payment dispute by way of a settlement and payment agreement. As part of that agreement, Wylie agreed to pay First Wind's attorney fees incurred in defending the claims brought by Specialized.

The contract between Wylie and Specialized prohibited Specialized from asserting claims for nonpayment of freight charges against Wylie's customer:

> Carrier [Specialized] further acknowledges and agrees that Broker [Wylie] is an independent contractor as to its customer, and is not the agent of any customer. Accordingly, Carrier agrees that is shall not look to the customer of Broker under any circumstances for payment for freight charges. On all shipments arranged to be shipped by Carrier pursuant to this Agreement, Carrier shall invoice Broker and Broker only. Broker agrees to perform all billing to any shipper, receiver, consignor or consignee for freight charges in connection with loads and/or traffic arranged by Broker and transported by Carrier. Payment of the freight charges to the Broker shall relieve shipper, receiver, consignor or consignee of any liability to the Carrier for nonpayment of charges, notwithstanding the failure of the shipper, receiver, consignor or consignee to sign off on Section 7 of the Bill of Lading. Carrier's sole recourse for payment of freight charges shall be the Broker.

(Doc. #80-3, Paragraph 5.2). Despite this provision, Specialized sent demand letters to First Wind. Specialized also asserted claims in this action against First Wind with regard to the nonpayment of freight charges. Specialized's actions violated the plain language of the contract it signed with Wylie.

While perhaps also a term of the settlement and payment agreement between Wylie and First Wind, Wylie was contractually obligated to pay for First Wind's attorney fees. The transportation agreement between First Wind and Wylie includes an indemnification provision:

**15. Indemnification.**
**(a) By Carrier.** Carrier [Wylie] shall defend, indemnify, and hold Shipper [First

16

> Wind], its employees and agents harmless from and against all claims, liabilities, losses, damages, fines, penalties, payments, costs, and expenses (including, without limitation, reasonable legal fees) caused by breach of this Agreement by Carrier and the negligence or intentional acts or omissions of Carrier, its employees, subcontractors (other than the rail carrier and its agents) or agents.

(Doc. #80-4). Wylie had a contractual obligation to indemnify First Wind for all claims based on "the negligence or intentional acts or omissions of [Wylie's] . . . subcontractors." Specialized's claims against First Wind in this action fall within the parameters of the indemnification provision.

Specialized, relying on the American Rule, contends Wylie's claim for recovery of attorney fees paid to First Wind must be dismissed. Wylie is not, however, attempting to recover attorney fees it paid to defend itself. The North Dakota Supreme Court has held that attorney fees and expenses resulting from the breach of a contract may be recovered as damages but the fees and expenses incurred in proving the breach may not be recovered. See Barsness v. Gen. Diesel & Equip. Co., Inc., 422 N.W.2d 819, 827 (N.D. 1988). Here, Wylie seeks to recover the attorney fees it was contractually obligated to pay to First Wind because Specialized asserted claims for nonpayment of freight charges against First Wind, which was in contravention of the plain language of the contract signed by Specialized. The Court finds Wylie's claim for attorney fees is not subject to dismissal as a matter of law. Specialized's motion to dismiss Wylie's claim for attorney fees is **DENIED**.

## VI. Decision

For the foregoing reasons, Wylie's motion for partial summary judgment to limit the damages to the outstanding line haul invoices is DENIED. Specialized's motion for partial

17

summary judgment is GRANTED, IN PART and DENIED, IN PART.  Specialized may present evidence of its damages for nonpayment of detention and standby costs, police escort fees, crane costs, bucket truck expenses, and flat bed expenses at trial.  Additionally, while there appears to be only a remote likelihood of success, Specialized may also present evidence of its alleged special damages for the loss of two trailers and the loss of a down payment on two trailers. Specialized request for dismissal of Wylie's claim for attorney fees is denied. The attorney fees arise from a contractual obligation that Wylie incurred as a result of Specialized's breach of its contract with Wylie. Thus, the attorney fees may be recoverable as an element of damages.

**IT IS SO ORDERED**.

Dated this 30th day of April, 2013.

/s/ Ralph R. Erickson
Ralph R. Erickson, Chief Judge
United States District Court